1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LUCI HOOD,

                              Plaintiff,

        v.

KING COUNTY, *et al.*,

                              Defendants.

No. C15-828RSL

ORDER GRANTING HOSPITAL
DEFENDANTS' JOINT MOTION
FOR SUMMARY JUDGMENT AND
KING COUNTY DEFENDANTS'
JOINT MOTION FOR SUMMARY
JUDGMENT

        This matter comes before the Court on the joint motion for summary judgment of

defendants Highline Medical Center and Fairfax Hospital, Dkt. # 64, and on the joint motion

for summary judgment of defendants King County, the King County Sheriff's Office, King

County Sheriff's Deputies Scott Click, Carlos Bratcher, and Eric White, and King County

Designated Mental Health Professional Gail Bonicalzi, Dkt. # 68.  In this case, plaintiff Luci

Hood seeks damages for harm allegedly suffered during her detention and involuntary

treatment by King County, the two hospitals, and their respective employees.  Those

defendants ask the Court to dismiss all of the claims against them with prejudice.  Having

reviewed the memoranda, declarations, and exhibits submitted by the parties,[1] and having heard

_____

        [1] Plaintiff filed a "Motion to Strike the Joint Summary Judgment Motion of Highline Medical
Center and Fairfax Hospital, or to Limit Reply."  Dkt. # 94.  In that motion, plaintiff urges the Court to
strike defendants' motion for summary judgment as insufficiently supported by admissible affidavits or

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1    oral argument on the hospitals' motion, the Court finds and rules as follows.

2                                    **I.  BACKGROUND**

3              In light of the sensitive nature of the facts underlying this case, the Court has filed the full

4    version of this order under seal.  An abbreviated summary of the facts appears in this unsealed

5    order.

6              In the days leading up to plaintiff Luci Hood's involuntary treatment, the King County

7    Sheriff's Office received a series of calls from Ms. Hood's neighbors in White Center,

8    Washington.  After 10:00 p.m. on May 6, 2013, Dean Smotherman and Robert Tacker

9    separately called 911 to report that their neighbor, Ms. Hood, was playing loud music in

10   violation of the local noise ordinance.  Dkt. # 73, ¶ 3.  Mr. Smotherman informed the 911

11   dispatcher that Ms. Hood owned guns and had been frustrated with recent events in the

12   neighborhood.  Dkt. # 73, ¶ 3; id. at 5.

13             Around 5:26 a.m. on May 7, 2013, Mr. Tacker called 911 to report that Ms. Hood was

14   outside mowing her lawn with a gas-powered lawnmower.  Dkt. # 70, ¶ 5; id. at 12.  In

15   response to Mr. Tacker's call, King County Sheriff's Deputy Juan Gil visited Ms. Hood's

16   house, gave her a warning, and asked her to wait to mow her lawn until later in the day.  Id. at

17   ¶ 5; Dkt. # 73, ¶¶ 6–7.  Though Ms. Hood responded with a "tirade," she turned off the

18   _____

19   declarations.  Defendants' motion incorporates by reference the materials filed in support of defendants'
     first motion for summary judgment.  Plaintiff argues that these materials are inadmissible hearsay, but
20   the Court finds that, in this civil case, all of the documents are subject to a hearsay exception either as
     business records or as public records.  See Fed. R. Evid. 803(6), -(8); United States v. Hall, 419 F.3d
21   980, 987 (9th Cir. 2005).

22             Alternatively, plaintiff asks the Court to decide defendant's summary judgment motion without
     relying on evidence and argument presented for the first time in defendant's summary judgment reply
23   brief, Dkt. # 97.  It is true that the Court may not rely on new evidence submitted in a moving party's
     reply brief without giving the non-moving party an opportunity to respond.  See Provenz v. Miller, 102
24   F.3d 1478, 1483 (9th Cir. 1996).  Accordingly, the Court has not relied on evidence or argument
     submitted with defendants' reply brief, including the two declarations filed in support of that reply, Dkt.
25   ## 99, 100.

26   ORDER GRANTING DEFENDANTS'
     MOTIONS FOR SUMMARY JUDGMENT

lawnmower.  Dkt. # 73, ¶ 7.  Shortly after Deputy Gil left, however, Ms. Hood resumed

mowing her lawn, and at 5:40 a.m. Mr. Tacker again called 911.  Dkt. # 70, ¶ 6; id. at 14; Dkt.

# 72, ¶ 5.

King County Sheriff's Deputy Carlos Bratcher drove to the scene, where Mr. Tacker

informed him that Ms. Hood had been on a "rant" over the past day or so due to another

neighbor's decision to cut down a tree on that neighbor's property.  Dkt. # 70, ¶ 7; id. at 9.

Mr. Tacker told Deputy Bratcher that Ms. Hood had been playing loud music the night before,

apparently to disturb her neighbors.  As Deputy Bratcher was speaking to Mr. Tacker, he heard

a woman's voice talking loudly and yelling out, "fuck you."  Ms. Hood emerged onto her front

porch, but upon seeing Deputy Bratcher she immediately went back inside.  Dkt. # 70, ¶ 7; id.

at 9.

Once King County Sheriff's Deputy Scott Click arrived to assist, Deputy Bratcher and

Deputy Click knocked on Ms. Hood's door and asked her to open it so they could talk.

Ms. Hood refused.  Dkt. # 70, ¶ 8; id. at 9; Dkt. # 72, ¶ 6.  The deputies could hear Ms. Hood

yelling about having been attacked by pit bulls, calling her black neighbors criminals, and

claiming that she had been accused of being a child molester because of her sexual orientation.

Dkt. # 70, ¶ 8; id. at 9; Dkt. # 72, ¶ 6.  Based on their experience and crisis intervention

training,[2] Deputies Bratcher and Click believed that Ms. Hood was suffering from mental

illness, and Deputy Bratcher called the King County mental health crisis line to advise them of

the deputies' contact with Ms. Hood.  The deputies did not believe that involuntary treatment

was warranted at that time.  After placing this call, Deputy Bratcher and Deputy Click

departed.  Dkt. # 70, ¶ 9; id. at 9; Dkt. # 72, ¶¶ 6–7.

---

[2] Deputies Bratcher and Click have both completed 40-hour crisis intervention trainings.  Dkt. # 70, ¶ 3.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

Shortly after the deputies left the area, Ms. Hood resumed her mowing.  At 7:02 a.m., Mr. Tacker once again called 911.  Dkt. # 70 at 16.  Because it was then past 7:00 a.m., however, the 911 operator informed Mr. Tacker that the noise ordinance no longer applied.  Id. at 17–18.

Just after 9:00 a.m., 911 received a call from Kenneth Gurley, who reported that he had been hired to cut down a tree on Ms. Hood's street and that a woman was yelling at him for removing the tree.  Dkt. # 70 at 19–21.  Around the same time, 911 received a call from a woman in the same area reporting that her neighbors were "fighting over a tree."  Dkt. # 70 at 23.  Deputies Bratcher and Click set out once again for Ms. Hood's house.  Dkt. # 70, ¶ 11; Dkt. # 72, ¶ 8.  Before they arrived, Mr. Gurley called 911 to report that the woman was threatening to break the tree-cutters' chainsaws with a baseball bat.  The dispatcher told Mr. Gurley that officers were on the way.  Dkt. # 70, ¶ 25.

Ms. Hood testifies that on May 6, 2013, she researched the legality of cutting down the tree, and that a government employee informed her that the neighbor lacked a permit to fell the tree.  Dkt. # 105, ¶¶ 4–5.  The government employee told Ms. Hood that if workers arrived to take down the tree, Ms. Hood should take photographs to document this activity.  Id., ¶ 5.  When Ms. Hood heard the workers arrive around 9:00 a.m. on May 7, she opened her safe, took out her camera, and went outside to take pictures and video.  Id., ¶ 8.

When Deputies Bratcher and Click arrived around 9:15 a.m., they observed Ms. Hood "standing in the street screaming at the workers."  Dkt. # 72, ¶ 9; id. at 10.  The deputies began interviewing Mr. Gurley and his crew, who stated that Ms. Hood was trying to stop them from cutting down the tree and had threatened to break their chainsaws with a baseball bat.  Dkt. # 72, ¶ 9.  Ms. Hood soon intervened and told the deputies that the workers did not have permission to cut down the tree.  Deputy Bratcher noticed that Ms. Hood's demeanor was "loud and angry" and that her "statements did not track well."  Deputy Bratcher testified that

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

Ms. Hood admitted to threatening the workers, Dkt. # 70, ¶¶ 12–13, and Deputy Click observed Ms. Hood step toward the workers in an aggressive way, Dkt. # 72, ¶ 9–10; id. at 10. Ms. Hood denies threatening the workers or their equipment.  Dkt. # 105, ¶¶ 9, 16–17.

Observing that Ms. Hood's behavior "corroborated her prior threats," the deputies determined that they had reason to believe Ms. Hood's mental condition made her a danger to herself or others and initiated involuntary commitment proceedings under the Involuntary Treatment Act ("ITA"), RCW §§ 71.05.010–71.05.950.  Dkt. # 70, ¶ 13; Dkt. # 72, ¶ 10.  The deputies handcuffed Ms. Hood and called an ambulance.  Dkt. # 70, ¶¶ 13–14; Dkt. # 72, ¶¶ 10–11; id. at 10.

Before the ambulance arrived, Ms. Hood placed several calls to 911.  She told the 911 dispatcher that the police were not helping her, that her house was open, and that she was "going to take a shit" and was "taking off [her] pants."  Dkt. # 70 at 27–31.  While Ms. Hood was placing these calls, Deputies Bratcher and Click observed Ms. Hood "attempting to defecate."  Dkt. # 70, ¶ 14; Dkt. # 72, ¶ 11; id. at 10.  Ms. Hood testifies that she had asked to go inside to use the bathroom, but that the deputies had ignored this request, and so she wet her clothes.  She testifies that, to keep the urine from touching her skin, she "shimmied her pants down a bit," but that she never attempted to pull her pants down to defecate.  Dkt. # 105, ¶¶ 14–15.

Around 10:34 a.m., after an ambulance had taken Ms. Hood to Highline Medical Center, animal control collected Ms. Hood's dogs.  Deputies Bratcher and Click confirmed that the door to Ms. Hood's house was locked and then departed.  Dkt. # 70, ¶ 16; Dkt. # 72, ¶ 12.

The ambulance brought Ms. Hood to Highline Medical Center, where she was evaluated and treated pursuant to the Involuntary Treatment Act (ITA), RCW §§ 71.05.010–71.05.950.

Around 8:32 p.m., while Ms. Hood was detained at the hospital, Ms. Hood's neighbors, Christine and Dean Smotherman, called 911 to report that they had seen a strange vehicle

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

parked in front of Ms. Hood's house, with a woman sitting inside.  They saw an unknown man run toward the car with an object in his hands, and then saw the car speed away.  Dkt. # 69, ¶ 3.  When King County Sheriff's Deputies responded to the call, they discovered that someone had made a forced entrance into Ms. Hood's house.  They also discovered several of Ms. Hood's belongings on the ground in Ms. Hood's yard.  Presuming that these items had been dropped by a burglar, the deputies collected the belongings and brought them back to the Sheriff's Office for cataloguing.  Dkt. # 69, ¶ 4.

Around 11:30 p.m., King County Sheriff's Deputy Adam Easterbrook came to the hospital and informed Ms. Hood that her home had been burglarized.  Dkt. # 105, ¶ 20.  Hospital staff permitted Ms. Hood to accompany Deputy Easterbrook to her house to secure her belongings, including her safe and her firearm.  Dkt. # 105, ¶ 21.  Deputy Easterbrook then brought Ms. Hood back to the hospital, where she remained overnight.  The burglary investigation was assigned to Deputy Eric White.

The next day, Ms. Hood was transported in an ambulance to Fairfax Hospital, where she remained under the involuntary detention order until May 10, 2013.

On May 13, 2013, Deputy White contacted Ms. Hood to arrange to return the catalogued property.  Dkt. # 69, ¶ 7.  Ms. Hood was extremely upset and claimed that she was missing hundreds of thousands of dollars' worth of property.  Id.  Later that same day, Ms. Hood visited the precinct to give Deputy White a crowbar that Ms. Hood claimed had been used to break into her house.  This crowbar was logged into evidence for fingerprint testing.  Dkt. # 69, ¶ 8; id. at 21–25.

Between May 14 and May 17, 2013, Ms. Hood called and emailed Deputy White multiple times about his investigation.  In these communications, Ms. Hood described additional property damage, which she valued at $5,000, and suggested that the Sheriff's Office and her

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

neighbors were complicit in the burglary.  Ms. Hood mentioned a pending lawsuit against the Sheriff's Office and claimed that King County was liable for her property losses.  Dkt. # 69, ¶¶ 9–14; id. at 28–32, 35–37.   Deputy White continued to investigate the burglary and interviewed the Smothermans' daughter, whom Ms. Hood had alleged was involved.  Dkt. # 69, ¶¶ 11–12; id. at 15–19.

On May 21, 2013, Deputy White received a voicemail that Ms. Hood had left on May 17. In this voicemail, Ms. Hood accused the Sheriff's Office of stealing her property and instructed Deputy White not to contact her again.  Dkt. # 69, ¶ 14; id. at 41–43.  In light of this message, Deputy White decided to inactivate the investigation on the grounds that he could not proceed without Ms. Hood's cooperation.  Dkt. # 69, ¶ 15; Dkt. # 107 at 20.  In August 2013, at the request of Ms. Hood's counsel, Deputy White reactivated the investigation but was unable to develop the case any further.  Dkt. # 69, ¶ 16.

In May 2015, Ms. Hood filed this suit in King County Superior Court against King County, the King County Sheriff's Office, Deputies Click, Bratcher, and White, and DMHP Bonicalzi (collectively, "King County"); the two hospitals; and multiple unidentified employees of the county and the hospitals.  Dkt. # 1-1.[3]  Ms. Hood claims that the defendants are jointly and severally liable for:

1.   Violations of 42 U.S.C. § 1983;

2.   "Violation of [their] own policies prohibiting the restraint of individuals unless they are gravely disabled or a danger to themselves or others";

---

[3]  Ms. Hood also sued Deputy Easterbrook, King County Major Ted Stensland, and Ken Gurley, one of the workers allegedly involved in the May 7, 2013 incident that led to Ms. Hood's involuntary detention. Dkt. # 1-1 at 2. After Mr. Gurley failed to respond, the Clerk of Court granted Ms. Hood's motion for default as to Mr. Gurley.  Dkt. # 15.  In March 2016, the parties stipulated to dismissal of Deputy Easterbrook and Major Stensland.  Dkt. # 47.  Ms. Hood filed an amended complaint in May 2016.  Dkt. # 56.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

3.    "Restraining plaintiff, and continuing to restrain plaintiff, without probable
      cause";

4.    "Forcing medical services upon plaintiff without permission of the plaintiff";

5.    "Assault and invasion of plaintiff's personal privacy without her permission
      when no medical emergency exists";

6.    Negligence and negligent supervision;

7.    "Restraining and retaining plaintiff under medical care in violation of her
      rights to life, liberty, and the pursuit of happiness";

8.    "Restraining and holding plaintiff contrary to reasonable professional
      judgment";

9.    "Purposeful withholding of police protection and police investigation of
      burglary";

10.   Outrage.

Dkt. # 1-1 at 14.  King County timely removed the case to federal court.  Dkt. # 1.  The two

hospitals jointly moved for summary judgment in February 2016.  Dkt. # 22.  The Court denied

that motion on the grounds that Ms. Hood had not yet had sufficient time to develop

affirmative evidence of the hospitals' alleged bad faith or gross negligence, and that five

depositions of hospital employees had been scheduled.  Dkt. # 35.  Shortly after, Ms. Hood

amended her complaint to name specific hospital and county employees as defendants.  Dkt.

## 29, 53, 56.

The hospitals filed this second joint motion for summary judgment and for sanctions

under Local Rule 11.  Dkt. # 64.  King County also moves for summary judgment, Dkt. # 68.

## II.  DISCUSSION

After reviewing the applicable summary judgment standard, this order addresses the two

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1  summary judgment motions in turn.

2  **A.    Summary Judgment Standard**

3         Summary judgment is appropriate when there is no genuine dispute as to any material fact

4  which would preclude the entry of judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

5  moving party bears the initial burden of identifying those portions of the pleadings,

6  depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the

7  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

8  Once the moving party has satisfied its burden, it is entitled to summary judgment if the

9  nonmoving party fails to designate specific facts showing that there is a genuine issue of

10 material fact for trial.  Id. at 324.  "The mere existence of a scintilla of evidence in support of

11 the non-moving party's position is not sufficient," and factual disputes whose resolution would

12 not affect the outcome of the suit are irrelevant to the consideration of a motion for summary

13 judgment.  Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001);

14 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court will view the evidence

15 in the light most favorable to the nonmoving party and draw all reasonable inferences in that

16 party's favor.  Mueller v. Auker, 576 F.3d 979, 991 (9th Cir. 2009).

17 **B.    King County's Motion for Summary Judgment**

18        King County argues that all of Ms. Hood's claims are barred by either absolute or

19 qualified immunity under state and federal law.  Ms. Hood contends that the King County

20 defendants are not entitled to immunity because they acted with bad faith or gross negligence,

21 and in clear violation of the Fourth Amendment.

22

23

24        **1.     Qualified Immunity Under the Involuntary Treatment Act**

25

26 ORDER GRANTING DEFENDANTS'
   MOTIONS FOR SUMMARY JUDGMENT

The Involuntary Treatment Act ("ITA") establishes procedures for appropriate medical intervention when, as the result of a mental disorder, a person presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled.  RCW 71.05.153. Ms. Hood does not dispute that she was detained pursuant to the ITA, nor does she contest the facial constitutionality of the ITA's detention procedures.[4]  Rather, Ms. Hood argues that the ITA's qualified immunity provision does not apply.

County employees performing functions necessary to the administration of the ITA enjoy qualified immunity for duties "performed in good faith and without gross negligence."  RCW 71.05.120.  This immunity extends to any "peace officer responsible for detaining a person pursuant to this chapter," as well as to any "county designated mental health professional, [or] the state, a unit of local government, or an evaluation and treatment facility."  RCW 71.05.120(1).  Covered functions include "the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment."  Id. Moreover, county DMHPs enjoy qualified immunity from liability for "making or filing an application alleging that a person should be involuntarily detained, certified, committed, treated, or evaluated" so long as that application was made in good faith.  RCW 71.05.500.

Ms. Hood seeks damages based on the decisions of Deputy Bratcher, Deputy Click, and DMHP Bonicalzi to detain her for evaluation and treatment pursuant to the ITA.  Accordingly, to the extent these decisions and actions were made in good faith and without gross negligence, the ITA shields the King County defendants from civil liability for any damages that resulted from Ms. Hood's involuntary detention.  Although good faith is ordinarily a question of fact, it may be resolved on summary judgment where no reasonable minds could differ on the question.  Morris v. Swedish Health Servs., 148 Wn. App. 771, 778 (2009); Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004) (noting that qualified immunity is particularly

---

[4]  A Washington court has held that the ITA's emergency detention procedures do not violate procedural due process.  See In re Detention of June Johnson, 179 Wn. App. 579, 591 (Ct. App. 2014).

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

amenable to summary judgment adjudication).

Ms. Hood has not identified a genuine issue of material fact regarding whether the deputies and DMHP Bonicalzi acted in bad faith or with gross negligence.  In essence, Ms. Hood argues that the county employees violated the standard of care because they *incorrectly* concluded that Ms. Hood presented an imminent likelihood of serious harm to herself or others.  But such a post-hoc judicial evaluation of the circumstances in which the county employees acted is precisely the sort of merits determination that qualified immunity guards against.  Rather, the bad faith analysis looks for "'actual or constructive fraud' or a 'neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'"  <u>Overly v. NAHC of Wash., Inc.</u>, 106 Wn. App. 1053, at *3 (2001) (quoting <u>Spencer v. King County</u>, 39 Wn. App. 201, 206 (1984)).  And gross negligence is "negligence substantially and appreciably greater than ordinary negligence."  <u>Id.</u>  In this case, there is no evidence of fraud, sinister motive, or a gross deviation from the standard of care.

Ms. Hood does not dispute that, by the time the deputies made the decision to detain her, they had been told that Ms. Hood had threatened to harm the tree-cutters and their property; nor does Ms. Hood dispute that the deputies had observed Ms. Hood's distress over the tree and, based on their experience and training, judged it to be abnormal.  Importantly, Ms. Hood does not dispute that Deputies Bratcher and Click had already encountered Ms. Hood earlier that day and, despite their conclusion that Ms. Hood might be suffering from mental illness, had decided not to detain her at that time.  Dkt. # 70, ¶¶ 8–9; <u>id.</u> at 9; Dkt. # 72, ¶¶ 6–7.  Though Ms. Hood challenges the truth of the information that the deputies acted on – such as the tree-cutters' report that she had threatened to break their equipment – Ms. Hood identifies no evidence suggesting that the deputies acted on that information fraudulently or with a sinister

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

motive.[5]  See Peng v. Mei Chin Penghu, 335 F.3d 970, 978 (9th Cir. 2003) (holding that summary judgment on qualified immunity grounds was not precluded by factual disputes immaterial to what arresting officer knew at the time of the arrest).

Ms. Hood also fails to identify evidence that DMHP Bonicalzi acted in bad faith or grossly deviated from the applicable standard of care in assessing Ms. Hood.  Ms. Hood presents expert testimony from a psychologist, Dr. Paula Van Pul, Ph.D., LMHC, SOTP (Dkt. # 90), who testifies, on the basis of her experience as a mental status examiner in hospitals, jails, prisons, and the community, Dkt. # 85, ¶¶ 3–4, that DMHP Bonicalzi violated the standard of care.  Though Dr. Van Pul has never trained or worked as a DMHP, she testifies that the same standard of care applies to mental status examinations regardless of the type of professional administering the examination, and that she has "interfaced as part of [her] professional work from day to day with County Mental Health Professionals, with Social Workers and other professionals at hospital emergency rooms and inpatient settings assessing persons presented for evaluation either voluntarily or involuntarily." Id. at ¶ 4.  Testimony on this basis is not sufficient to establish the standard of care applicable to designated mental health professionals evaluating the necessity of an emergent detention under the ITA.  See McKee v. American Home Products, Corp., 113 Wn. 2d 701, 706–07 (Wash. 1989) ("The duty of physicians must be set forth by a physician, the duty of structural engineers by a structural engineer and that of any expert must be proven by one practicing in the same field – by one's

---

[5] Perhaps to establish a bad faith motive, Ms. Hood argues that Deputy Click "admitted that he tires of going to neighborhood disputes, and he wanted to remove Hood so resources could be used somewhere else in the community." Dkt. # 104 at 6.  But to the contrary, when Ms. Hood's counsel suggested this to Deputy Click during his deposition, Deputy Click responded that "It's my job to get her help.  That's what I was attempting to do."  When Ms. Hood's counsel pressed Deputy Click, "but isn't it difficult when you have continuous calls from the same neighborhood among neighbors who are fighting with each other?", Deputy Click responded, "Sure.  There's other people that would need my attention.  I can't spend all day with one person.  That's a part of getting her help so she isn't a burden on our resources." Dkt. # 106-1 at 9.  The Court is not persuaded by the attempt to re-frame this exchange in Ms. Hood's brief.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

peer."); RCW 7.70.040 (defining the standard of care as "that degree of care, skill, and learning expected of a reasonably prudent health care provider . . . *acting in the same or similar circumstances*" (emphasis added)).

It is true that an exception to the expert testimony requirement exists when the standard of care is self-evident, but this exception applies to situations approximating *res ipsa loquitur*, such as the amputation of a healthy limb.  See Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 228 (1989).  The circumstances of this case are not such that "the want of skill or lack of care is so apparent to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it." Id. at 228–29 (quoting Hart v. Steele, 416 S.W.2d 927, 932 (Mo. 1967)).  Thus, absent expert testimony from a Washington DMHP establishing the standard of care for an emergent detention under the ITA, Ms. Hood has not identified evidence of gross negligence defeating DMHP Bonicalzi's statutory immunity.

While Ms. Hood may disagree with the conclusions that the county employees reached based on the information presented to them, she has failed to identify any evidence of "interested or sinister motive" to rebut the county employees' good faith or any evidence of gross negligence.  Accordingly, King County has met its burden of showing an absence of evidence demonstrating bad faith or gross negligence on the part of Deputy Bratcher, Deputy Click, and DMHP Bonicalzi, entitling them to qualified immunity under RCW 71.05.120(1) and RCW 71.05.500 as to all of plaintiff's state law claims.[6]  See Overly, 106 Wn. App. at *5 (affirming summary judgment where non-moving party identified no evidence suggesting that defendants acted in bad faith or with gross negligence).

**2.     Qualified Immunity Under Federal Law**

---

[6] While this statutory immunity bars Ms. Hood's state law claim of outrage, the Court further concludes that, absent any evidence of "extreme or outrageous conduct" or "intentional or reckless infliction of emotional distress," Ms. Hood has failed to allege facts stating a claim for outrage.  See Kloepfel v. Bokor, 149 Wn. 2d 192, 195–96 (2003).

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

The county employees' statutory immunity does not end the analysis, however. Immunities created by state law cannot bar federal civil rights claims.  Pardi v. Kaiser Foundation Hospital, 389 F.3d 840, 851 (9th Cir. 2004) ("Conduct by persons . . . which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law." (quoting Kimes v. Stone, 84 F.3d 1121, 1127 (9th Cir. 1996)).  Thus, statutory immunity does not shield the deputies and DMHP Bonicalzi from any cognizable constitutional claims.

Ms. Hood's complaint lodges several constitutional claims against all the defendants in this case.  Though Ms. Hood's first amended complaint (Dkt. # 56) lists "violation of 42 U.S.C. § 1983" as a standalone claim, Ms. Hood's subsequent claim for deprivation of her constitutionally protected liberty interests must be asserted through the cause of action established by 42 U.S.C. § 1983.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, (1978) (holding that local governing bodies can be sued directly under Section 1983 for constitutional violations); McMillian v. Monroe Cty., Ala., 520 U.S. 781, 783 (1997) (applying Monell to suit for damages against a county).  Government employees effecting an ITA detention may be liable for unreasonable seizure in violation of the Fourth Amendment. See Maag v. Wessler, 960 F.2d 773, 775 (9th Cir. 1991).[7]

Deputy Bratcher, Deputy Click, and DMHP Bonicalzi enjoy qualified immunity from this

---

[7] Government employees effecting an ITA detention may also be liable for violations of substantive due process under the Fourteenth Amendment, see O'Connor v. Donaldson, 422 U.S. 563, 573–76 (1975); indeed, Ms. Hood cites this principle – not the Fourth Amendment's right against unreasonable seizures – in her brief, Dkt. # 104 at 13.  But because Ms. Hood's legal argument relies exclusively on cases discussing Fourth Amendment violations, the Court analyzes Ms. Hood's argument under that constitutional provision.  To the extent Ms. Hood disputes the King County employees' qualified immunity from liability under the Fourteenth Amendment, the Court concludes that she has failed to meet her burden of showing the violation of a clearly established right.  See Alston v. Read, 663 F.3d 1094, 1098 (9th Cir. 2009).

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

constitutional claim, however, because Ms. Hood has not shown that their conduct violated clearly established constitutional rights. See Saucier v. Katz, 533 U.S. 194, 201 (2001) (holding that qualified immunity exists unless (1) the facts show the violation of constitutional right (2) that was clearly established in law at the time of the action); Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that courts may consider either prong of the qualified immunity inquiry first); Alston v. Read, 663 F.3d 1094, 1098 (9th Cir. 2009) (noting that plaintiff bears the burden of showing that constitutional right was clearly established). For a constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Alston, 663 F.3d at 1098 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The contours of Ms. Hood's rights in this case were not sufficiently clear.

On the one hand, it is true that Deputy Bratcher, Deputy Click, and DMHP Bonicalzi acted pursuant to the ITA in detaining Ms. Hood, as they reasonably believed that she was suffering from mental illness and posed an imminent risk to herself or to others. See RCW 71.05.153(2) (granting officers the authority to detain a person for mental evaluation upon "reasonable cause to believe that such person is suffering from a mental disorder and presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled"); RCW 71.05.153(1) (granting DMHPs the authority to detain a person for mental evaluation "after investigation and evaluation of the specific facts alleged and of the reliability and credibility of the person or persons providing the information").

But it is unsettled whether, for purposes of the qualified immunity analysis, meeting the statutory "reasonable cause" standard is sufficient to demonstrate compliance with the Fourth Amendment, or whether the traditional "probable cause" standard applies. Compare Luchtel v. Hagemann, 623 F.3d 975, 979 (9th Cir. 2010) (applying statutory "reasonable cause" standard

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

in determining legality of ITA detention), with Maag, 960 F.2d at 775–76 (applying "probable cause" standard where statute is silent).  Thus, a deputy or DMHP confronted with a candidate for ITA detention would not have reason to know whether facts satisfying the statutory standards for detention were sufficient, or whether the Fourth Amendment requires more. Moreover, King County highlights a Ninth Circuit decision, issued two months after Ms. Hood's detention, granting qualified immunity on the grounds that "no decisional authority in this or other circuits" clearly established the contours of the Fourth Amendment's protections in the context of involuntary civil commitment.  See Landry v. Berry, 533 F. App'x 702, 703 (9th Cir. 2013).

Ms. Hood herself has not offered any case law that clearly establishes the wrongfulness of the deputies' conduct such that their decision to detain her can be called "plainly incompetent." See City & Cty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1774 (2015).  Ms. Hood compares her case to Meyer v. Bd. of Cty. Comm'rs of Harper Cty., Oklahoma, 482 F.3d 1232 (10th Cir. 2007), but in that case, one of the arresting officers "rel[ied] on deliberate falsehoods to establish probable cause to deprive a person of her liberty," id. at 1242.  Though Ms. Hood's brief claims that Deputy Click deliberately lied about the facts underlying her detention, the record does not support this assertion.[8]  As to DMHP Bonicalzi's violation of a clearly established right, Ms. Hood offers no legal authority or factual argument.  See Dkt. # 104 at 21. Accordingly, Deputies Bratcher, Deputy Click, and DMHP Bonicalzi are entitled to qualified

---

[8]  See supra note 5.  Furthermore, as discussed above, Ms. Hood's assertion that she did not threaten the tree-cutters, Dkt. # 104 at 6–7, does not undermine the reasonableness of the deputies' belief (even if mistaken) that she had, based on the 911 calls, the reports of the tree-cutters, and the deputies' own observations.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

immigration, and Ms. Hood's constitutional claims for deprivation of liberty must be dismissed.[9]

**3.     Failure to State a Claim for "Negligent Investigation"**

Ms. Hood claims that King County, the King County Sheriff's Office, and Deputy Eric White are liable for the losses from the burglary of Ms. Hood's home under a theory of "negligent investigation."  King County correctly points out that a claim for negligent investigation is not cognizable under Washington law.  M.W. v. Dep't of Soc. & Health Servs., 149 Wn.2d 589, 601 (2003); O'Brien v. City of Tacoma, 247 F. App'x 58, 60 (9th Cir. 2007) ("In Washington, a claim of negligent investigation will not lie against police officers.").  The King County defendants are entitled to summary judgment on Ms. Hood's claim for negligent investigation.

Ms. Hood also argues that when King County Sheriff's Deputies detained her, they assumed a special affirmative duty to protect her property, which they breached by failing to prevent the burglary of her home.  See Dkt. # 104 at 23–24.  Washington state regulations do require peace officers and DMHPs effecting an ITA detention to take reasonable precautions to secure the patient's home.  See Wash. Admin. Code § 388-877A-0280(11).  But Ms. Hood has not identified any evidence suggesting that Deputies Bratcher and Click failed to take reasonable precautions, other than the fact of the burglary itself.  It is undisputed that the deputies did not permit Ms. Hood to lock her home or her safe, but King County also offers evidence that, after Ms. Hood departed in an ambulance, the deputies locked Ms. Hood's home themselves and ensured that her dogs were cared for.  Dkt. # 70, ¶ 16; Dkt. # 72, ¶ 12. Ms. Hood identifies no evidence creating a factual dispute regarding whether the deputies

---

[9]  Because the Court finds that DMHP Bonicalzi is entitled to qualified immunity, it does not reach the question whether DMHPs enjoy absolute immunity from liability arising from their ITA emergent detention determinations.  See Dkt. # 68 at 9–14.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

locked her door; indeed, she testifies that her door was broken, implying that, as the deputies

assert, it had been locked at the time of the burglary.  Dkt. # 105, ¶ 21.  Ms. Hood cites no law

supporting her argument that the deputies' regulatory obligation to secure her home required

them to guard her home against burglaries in her absence.  The King County defendants are

entitled to summary judgment on Ms. Hood's negligence claims arising from the burglary of

her home.[10]

### 4.    Vicarious Liability

Finally, Ms. Hood claims that King County and the King County Sheriff's Office are

vicariously liable for the wrongdoing of Deputies Bratcher, Click, and White, and DMHP

Bonicalzi.  Ms. Hood has failed to identify any evidence of a policy or practice giving rise to

vicarious Section 1983 liability under Monell v. Dep't of Soc. & Health Servs., 436 U.S. 658,

694 (1978).  See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper

custom may not be predicated on isolated or sporadic incidents; it must be founded upon

practices of sufficient duration, frequency and consistency that the conduct has become a

traditional method of carrying out policy.").  Summary judgment for King County and the King

County Sheriff's Office is appropriate.

Accordingly, the Court GRANTS the King County defendants' motion for summary

judgment as to all of Ms. Hood's claims.

### C.    The Hospitals' Joint Motion for Summary Judgment

Highline Medical Center and Fairfax Hospital argue that all claims against them must be

dismissed because the hospitals are protected by qualified immunity under the ITA, and

---

[10] As with Ms. Hood's outrage claim against Deputy Bratcher, Deputy Click, and DMHP
Bonicalzi, Ms. Hood has failed to allege facts supporting an outrage claim against Deputy White, King
County, or the King County Sheriff's Office.  See supra note 6.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

because many of Ms. Hood's claims require state action but the hospitals were not acting as agents of the government.  The hospitals also request sanctions under Fed. R. Civ. P. 11 on the grounds that Ms. Hood's claims are frivolous, and that she has been on notice of their insufficiency since defendants' first motion for summary judgment in February 2016.

Ms. Hood opposes the hospitals' motion, arguing that genuine issues of material fact exist as to whether the hospitals fell below the relevant standard of care, whether the hospitals violated her civil rights, whether the hospitals are liable for the tort of outrage, and whether Highline Medical Center assaulted her by involuntarily undressing, restraining, and medicating her.  Dkt. # 81.

**1.   Qualified Immunity Under the Involuntary Treatment Act**

Like county employees, hospital staff performing functions necessary to the administration of the ITA enjoy qualified immunity for duties "performed in good faith and without gross negligence."  RCW 71.05.120.  This immunity extends to any "officer of a public or private agency . . . superintendent, professional person in charge, his or her professional designee . . . attending staff of any such agency . . . [and] any public official," as well as to any "county designated mental health professional, [or] the state, a unit of local government, or an evaluation and treatment facility."  RCW 71.05.120(1).  Covered functions include "the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment."  Id.

Ms. Hood seeks damages from the two hospitals based on the decisions of their staff and of county-designated mental health professionals to admit, detain, and medicate her, and on the actions taken by hospital staff to effectuate those decisions.  Accordingly, to the extent these decisions and actions were made in good faith and without gross negligence, the ITA shields the hospitals from civil or criminal liability for any damages that resulted from Ms. Hood's

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

involuntary detention.  As noted above, the issue of good faith may be resolved on summary judgment where no reasonable minds could differ on the question.  Morris, 148 Wn. App. at 778; Martin, 360 F.3d at 1081.

To demonstrate bad faith and/or gross negligence by medical providers, Ms. Hood must establish a violation of the applicable standard of care through the expert testimony of professionals who are peers in the relevant field.  RCW 7.70.040(1); McKee, 113 Wn. 2d at 706–07.  The hospitals may prevail on summary judgment if they demonstrate the absence of any qualified expert testimony on the issue of standard of care.  See Celetox Corp., 477 U.S. at 325.  To meet this burden, the hospitals argue that Ms. Hood's experts lack the medical expertise necessary to establish the standard of care applicable to her treatment.  As to the issue of standard of care,[11] Ms. Hood presents expert testimony from a pharmacist, Gloria M. Northcroft, RPH, MS (Dkt. # 83), and again from Dr. Paula Van Pul, Ph.D., LMHC, SOTP (Dkt. # 85).

Ms. Northcroft testifies, on the basis of her experience practicing in hospitals in Washington state, that the amount of medication administered to Ms. Hood was inappropriate and that the records kept regarding that medication were deficient.  Dkt. # 83, ¶¶ 4, 16.  Yet, as Ms. Northcroft admits, Ms. Hood was medicated pursuant to a physician's orders, and as a pharmacist, Ms. Northcroft "cannot substitute [her] clinical judgment for [that of] a physician," id. at ¶ 8.  Accordingly, Ms. Northcroft's testimony is not sufficient to establish the standard of care by which the physician's decision to medicate Ms. Hood, and in what amount, must be measured.

---

[11]  Ms. Hood also presents testimony from psychologist Mark B. Whitehill, Ph.D (Dkt. # 89), but Dr. Whitehill's testimony goes to the issue of damages, not standard of care.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1    Dr. Van Pul testifies, on the basis of her experience as a mental status examiner[12] in

2    hospitals, jails, prisons, and the community, Dkt. # 85, ¶¶ 3–4, that the hospitals deviated from

3    the standard of care.  Dr. Van Pul testifies that the same standard of care applies to mental

4    status examinations regardless of the type of professional administering the examination, and

5    that she has "interfaced as part of [her] professional work from day to day with County Mental

6    Health Professionals, with Social Workers and other professionals at hospital emergency rooms

7    and inpatient settings assessing persons presented for evaluation either voluntarily or

8    involuntarily." Id. at ¶ 4.  Dr. Van Pul further testifies that she is familiar with Washington

9    state law regarding a hospital's ability to remove a patient's clothing or to involuntarily

10   medicate a patient. Id. at ¶ 10.

11       Testimony on this basis is not sufficient to demonstrate the standard of care applicable to

12   medical providers responding to an ITA patient. See McKee, 113 Wn. 2d at 706–07 ("The

13   duty of physicians must be set forth by a physician, the duty of structural engineers by a

14   structural engineer and that of any expert must be proven by one practicing in the same field –

15   by one's peer."); RCW 7.70.040 (defining the standard of care as "that degree of care, skill,

16   and learning expected of a reasonably prudent health care provider . . . *acting in the same or*

17   *similar circumstances*" (emphasis added)).  Though Dr. Van Pul testifies that it violates the

18   standard of care to remove a patient's clothing to perform a *psychological evaluation*, this

19   testimony does not shed light on the standard of care applicable to medical staff caring for an

20   emergency room patient who has not yet been medically cleared.  Neither can Dr. Van Pul's

21       [12]  Dr. Van Pul earned her Ph.D in September 2014.  Dkt. # 85, ¶ 2.  Thus, while Ms. Hood is
22   correct that Dr. Van Pul's "credential is equal to the Psychologist at Fairfax, Dr. Spence," Dkt. # 81 at 9,
     the bulk of Dr. Van Pul's twenty-two years of experience – the grounds for Dr. Van Pul's present
23   testimony – precedes that credential.

24

25

26   ORDER GRANTING DEFENDANTS'
     MOTIONS FOR SUMMARY JUDGMENT

testimony establish the standard of care applicable to the medical providers' decision to medicate Ms. Hood without her consent.

Ms. Hood argues that, because the opinions of Ms. Northcroft and Dr. Van Pul would be admissible under Federal Rule of Evidence 702, those opinions are sufficient to create a genuine issue of material fact even though they are not grounded on the experience of professional peers. But as Ms. Hood acknowledges, while "artificial classification by professional title" does not control "the threshold question of admissibility of expert medical testimony in a malpractice case," "the scope of a witness's knowledge" does. Eng v. Klein, 127 Wn. App. 171, 172 (2005). As explained above, Ms. Northcroft and Dr. Van Pul lack experience in "the same or similar circumstances" as the medical providers whose standard of care they are critiquing. Thus, even though Ms. Northcroft and Dr. Van Pul might be qualified to testify as experts under Federal Rule of Evidence 702 on another issue, their testimony is not admissible for purposes of establishing the standard of care applicable to medical providers acting under the circumstances of this case.

Ms. Hood further argues that even if Ms. Northcroft's and Dr. Van Pul's opinions fail to establish the applicable standard of care, those standards are established by the provisions of the ITA and its implementing regulations. It is true that a patient involuntarily detained under the ITA has a right to wear his or her own clothes, but this right gives way "when deprivation of the same is essential to protect the safety of the resident or other persons." RCW 71.05.217 (1). Given the expertise and the situational judgment needed to determine whether deprivation of a patient's clothes "is essential to protect the safety of the resident or other persons," the Court cannot find a dispute of fact over whether Highline staff grossly deviated from the standard of care without expert testimony from emergency room staff with experience in ITA intake. As already discussed, Ms. Hood has presented none.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1    Ms. Hood has identified evidence in the record suggesting that Dr. Karakus, the

2  supervising psychiatrist at Fairfax, had a practice of never releasing involuntary patients out of

3  deference to the DMHPs, and that she always recommends holding involuntary patients for an

4  additional fourteen-day commitment.  Dkt. # 86 at 47.  The providers at Fairfax did not have an

5  affirmative responsibility to terminate the 72-hour hold ordered by the DMHPs at Highline,

6  and so their failure to do so in this case does not constitute gross negligence.  See 71.05.210

7  ("A person who has been detained for seventy-two hours shall *no later than* the end of such

8  period be released, unless . . . detained pursuant to court order for further treatment . . . ."

9  (emphasis added)).  Still, the ITA provides that, before petitioning for an additional fourteen-

10  day involuntary detention, hospital staff must analyze the patient's condition and find either a

11  continuing likelihood of serious harm, a grave disability, or a need for assisted outpatient

12  mental health treatment.  RCW 71.05.230(1).  Thus, Dr. Karakus's testimony that she *always*

13  recommends an additional fourteen-day detention raises a genuine issue of fact regarding

14  whether Fairfax grossly deviated from its responsibilities under the ITA to analyze the

    necessity of an additional detention before petitioning for one.  See RCW 71.05.230.

15    But Ms. Hood was detained at Fairfax under the DMHPs' 72-hour hold at the time of

16  Fairfax's decision to petition for an additional hold, and that petition was voluntarily dismissed

17  by King County at the conclusion of the 72-hour hold.  Thus, the dispute of fact over Fairfax's

18  decision to petition for an additional hold is not a material one.  See Arpin, 261 F.3d at 919

19  ("Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to

20  the consideration of a motion for summary judgment.").  As to all other claims against Fairfax,

21  Ms. Hood has identified no genuine issues of material fact regarding deviation from the

22  standard of care, and Fairfax is entitled to qualified immunity.

23    Accordingly, Highline Medical Center and Fairfax Hospital have met their burden of

24

25

26  ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1   showing an absence of evidence demonstrating bad faith or gross negligence, entitling them to

2   qualified immunity under RCW 71.05.020 as to all of Ms. Hood's state law claims.

3          **2.     State Action**

4          As noted above, immunities created by state law cannot bar federal civil rights claims.

5   Pardi, 389 F.3d at 851.  Thus, statutory immunity does not shield the hospitals from any

6   cognizable constitutional claims.

7          Ms. Hood's complaint lodges several constitutional claims against all the defendants in

8   this case, including the hospitals.  Of course, Section 1983 establishes a cause of action only

9   against state actors.  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) ("Like the

10  state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of

11  § 1983 excludes from its reach merely private conduct, no matter how discriminatory or

12  wrongful.").  Thus, Ms. Hood may recover damages from the hospitals for constitutional

13  violations only if there was "a sufficiently close nexus between the State and the challenged

14  action of the regulated entity so that the action of the latter may be fairly treated as that of the

15  State itself."  Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974).

16         A sufficiently close nexus does not exist in this case.  In Jensen v. Lane County, 222 F.3d

17  570 (9th Cir. 2000), the Ninth Circuit held that where a private medical provider and a county

18  through its employees "have undertaken a complex and deeply intertwined process of

19  evaluating and detaining individuals who are believed to be mentally ill and a danger to

20  themselves or others," the government has "so deeply insinuated itself into this process that

21  there is 'a sufficiently close nexus between the State and the challenged action of the defendant

22  so that the action of the latter may fairly be treated as that of the State itself.'"  Jensen, 222

23  F.3d at 575 (quoting Jackson, 419 U.S. at 350).  Ms. Hood argues that Jensen controls here, but

the Court disagrees.

24

25

26  ORDER GRANTING DEFENDANTS'
    MOTIONS FOR SUMMARY JUDGMENT

In Blum v. Yaretsky, 457 U.S. 991 (1982), the U.S. Supreme Court found no state action where the challenged medical determinations were "made by private parties according to professional standards that are not established by the State." Blum, 457 U.S. at 1008. In Jensen, the Ninth Circuit distinguished Blum on the grounds that in Jensen, though the committing physician made the medical judgment under which the plaintiff was detained, "[c]ounty employees initiate[d] the evaluation process, [and] there [was] significant consultation with and among the various mental health professionals (including both [private] psychiatrists and county crisis workers)," such that the state's involvement in the decision-making process overrode the private provider's "purely medical judgment." Jensen, 222 F.3d at 575.

Such is not the case here. It is true that county law enforcement initiated Ms. Hood's ITA process; that county DMHPs relied significantly on the reports of hospital staff in conducting the assessment that led to Ms. Hood's 72-hour detention; that the hospital boarded Ms. Hood after the county DMHPs initiated the 72-hour detention; and that a hospital psychiatrist declined to release Ms. Hood apparently out of deference to the county DMHPs' detention recommendation. But unlike in Jensen, where the private practitioner was operating under contract with the county, 222 F.3d at 573, the private hospitals in this case were fulfilling their own statutory responsibilities under the ITA rather than a contractual responsibility to King County. Moreover, the plaintiff in Jensen was detained in a county psychiatric hospital, then discharged to the county jail, id., while in this case Ms. Hood was detained exclusively at private hospitals and then released.

The facts here reveal sustained and routine cooperation between King County and the hospitals, but they do not show that the county's involvement overrode the hospital staff's medical judgment such that the hospitals' actions can fairly be treated as those of the

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

government.  Accordingly, the hospitals were not acting under color of law, and Ms. Hood's constitutional claims against the hospitals for deprivation of liberty and privacy must be dismissed.  As discussed above, all remaining claims against the hospitals are barred by qualified immunity under the ITA.

The hospitals' joint motion for summary judgment is GRANTED.

### 3.    Rule 11 Sanctions

The hospitals also ask the Court to sanction Ms. Hood for failing to marshal sufficient expert testimony on the issue of standard of care, when she was alerted to the need for such testimony by the hospitals' first joint motion for summary judgment in February 2016.  Fed. R. Civ. P. 11(c).  While Ms. Hood's expert testimony was ultimately insufficient to defeat the hospitals' qualified immunity, the Court cannot conclude that presentation of that testimony was frivolous or calculated to harass or delay.  See Fed. R. Civ. P. 11(b).  As the Court ruled in its order denying the hospitals' first motion for summary judgment, Ms. Hood was entitled to an opportunity to elicit facts that might allow her experts to formulate opinions that could oppose summary judgment.  Dkt. # 35.  The Court will not require Ms. Hood to bear the cost of that discovery simply because it was unsuccessful.  Accordingly, the hospitals' request for sanctions is denied.

### III.  CONCLUSION

The Washington legislature has provided for the involuntary treatment of persons who, in the practiced judgment of first responders and medical specialists, are experiencing a mental health crisis that presents a danger to themselves or to others.  To ensure that providers effectuating that involuntary treatment are focused on the well-being of their patients rather than on the specter of civil liability, the legislature has established immunity for providers acting in good faith and without gross negligence.  The Court does not doubt that Ms. Hood's

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

experiences in this case were troubling, even traumatic – as involuntary treatment likely would be.  But neither does the Court doubt the judgment of the legislature, or of the officers and medical providers in this case.

For all the foregoing reasons, the King County defendants' motion for summary judgment (Dkt. # 68) is GRANTED.  Highline Medical Center and Fairfax Hospital's joint motion for summary judgment (Dkt. # 64) is GRANTED.  The hospitals' motion for Rule 11 sanctions is DENIED.  Plaintiff's motion to strike (Dkt. # 94) is GRANTED in part.[13]

SO ORDERED this 14th day of March, 2017.

_MW S Lasnik_
Robert S. Lasnik
United States District Judge

---

[13] See supra note 1.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT